**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| FRESHUN FLOWERS BEY, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.:  7:14-cv-02205-RDP |
| | } | |
| KENNETH ABRAMS, et al., | } | |
| | } | |
| Defendants. | } | |

**MEMORANDUM OPINION**

## I.     Introduction

This case is before the court on Defendants' Motions for Summary Judgment (Docs. # 52, 53).  Plaintiff, who is proceeding *pro se*, filed responses to the Motions.  (Docs. # 54, 55). Because Plaintiff's submissions proved difficult to follow and were in parts incomplete, the court entered an Order explaining potential deficiencies in his filings, and directed Plaintiff to file additional responses consistent with Rule 56 and this court's Appendix II.  (Doc. # 56).   In accordance with the court's Order, Plaintiff filed briefs in opposition of Defendants' motion, and the motion is now fully briefed.  (Doc. # 57, 58, 59, 60).

Plaintiff asserts various state and federal law claims stemming from his March 8, 2014 arrest and subsequent detainment.  Plaintiff's claims against the Defendant Officers[1] arise from Plaintiff's arrest at his home.  Plaintiff's claims against the Defendant Sheriffs[2] arise from allegedly abusive conduct that occurred during his subsequent detention at the Tuscaloosa County Jail.

---

[1]  Defendants John Conger, Steven Westbrook, and Anthony Parker.

[2]  Defendants Kenneth Abrams, Raymond Anderson, and Patrick Collard.

## II. Relevant Undisputed Facts[3]

On March 8, 2014, Defendants Steven Westbrook and Anthony Parker received a call from dispatcher, Joyce Mayfield, directing them to serve a writ of arrest on Tammie Smith Bey. (Doc. # 52 at pp. 19, 28, 39-40). Mayfield told Defendants that Tammie Smith Bey was sitting on the front porch of her residence, located at the corner of Martin Luther King Boulevard and 17th Street in Northport, Alabama. (*Id.* at p. 39). When Defendants Westbrook and Parker arrived at the corner, they saw Tammie Smith Bey -- who they knew from previous interactions -- on the front porch of the house where they had each seen her before. (*Id.* at pp. 19-20, 28-29). Plaintiff -- who Defendants Westbrook and Parker did not recognize -- was also on the porch. (*Id.*).

As Defendants Westbrook and Parker got out of their car and started walking towards the house, both Tammie Smith Bey and Plaintiff got up and went into the house. (*Id.* at pp. 20, 29). Defendant Parker knocked on the door, and Plaintiff eventually answered the door. (*Id.*). After Plaintiff opened the door, Defendant Parker could see Tammie Smith Bey inside the home, and Defendant Westbrook could hear her inside the home. (*Id.*). However, when they sought to arrest Tammie Smith Bey, Plaintiff attempted to close the door on Defendants Westbrook and Parker, and stated that they had no authority to detain her. (*Id.*). Defendant Parker stopped the door from closing, and grabbed Plaintiff to put him into custody for interfering with Tammie Smith Bey's arrest. (Doc. # 13, Exhibit B, Video of Arrest; Doc. # 52 at pp. 20, 29). A struggle ensued. (*Id.*). Defendant Conger responded to the corner of Martin Luther King Jr. Boulevard

---

[3] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox. V. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

and 17th Street after Defendants Parker and Westbrook began their attempt to arrest Plaintiff. (Doc. # 52 at p. 36). He arrived while Defendants Parker and Westbrook were still attempting to arrest Plaintiff on the porch, and he joined in their efforts to attempt to restraint Plaintiff. (Doc. # 13, Exhibit B, Video of Arrest; Doc. # 52 at p. 36). Eventually Defendants restrained Plaintiff, put him under arrest, and transported him to the Tuscaloosa County Jail. (Doc. # 13-4; Doc. # 52 at pp. 20, 29).

The writ of arrest listed Tammie Smith Bey's address as 1706 Martin Luther King Jr. Boulevard. (Doc. # 13-3). However, the house where Defendants arrested Plaintiff was 1702 Martin Luther King Jr. Boulevard – where Plaintiff was temporarily living by permission of a friend. (Doc. # 13 at ¶ 19; Doc. # 52 at p. 61). Defendants Parker and Westbrook did not have the writ of arrest in their possession at the time of their altercation with Plaintiff. (Doc. # 52 at pp. 20, 29). However, Defendant Parker had observed Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard approximately five or six times before March 8, 2014. (Doc. # 52 at p. 28). Defendant Parker had also spoken to Tammie Smith Bey in the front yard of 1702 Martin Luther King Jr. Boulevard when he was called out to the house for an issue with the water meter. (*Id.*). Defendant Westbrook had seen Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard approximately six times before March 8, 2014. (*Id.* at p. 19). Indeed, approximately two months prior to March 8, 2014, Defendant Westbrook responded to a car accident at the corner of Martin Luther King Jr. Boulevard and 17th Street, and took a witness statement from Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard. By contrast, neither Defendant Westbrook nor Defendant Parker had ever seen Tammie Smith Bey at 1706 Martin Luther King Jr. Boulevard. (*Id.* at pp. 21, 30). The houses located at 1702 and 1706 Martin Luther King Jr. Boulevard are next door to each other, and

share a common driveway.  (*Id.* at pp. 24, 26).  Moreover, neither of the houses located at 1702 and 1706 Martin Luther King Jr. Boulevard is marked with a street number.  (*Id.*).  At no time prior to, or during, the arrests did Plaintiff or Tammie Smith Bey tell Defendants that 1702 Martin Luther King Jr. Boulevard was not Tammie Smith Bey's house.  (Doc. # 13, Exhibit B, Video of Arrest; Doc. # 52 at pp. 21, 30).

When Plaintiff arrived at Tuscaloosa County jail, he was put in "the pink room."  (Doc. # 53-1, p. 304).  Jail Personnel asked Plaintiff his name, to which he replied "I am here unlawfully and at this time I can't give you my name."  (*Id.*).  Plaintiff represented to Defendants that he refused to provide his name, or allow Defendants to take his fingerprints or picture for a "mugshot."  (*Id.* at pp. 313-316).  Defendants tried to forcefully take Plaintiff's fingerprints on two separate occasions.  Defendants first tried to take Plaintiff's fingerprints at around 7:30 a.m. (*Id.* at p. 317; Doc. # 58, Security Camera Video, Video # 1 at 20:00).  Plaintiff refused to provide his fingerprints.  (*Id.*).  Accordingly, Defendants grabbed Plaintiff and tried to force his hands open.  (*Id.*).  A scuffle ensued.  The video footage of the incident shows jail personnel surrounding Plaintiff while they try to physically force his hands onto the fingerprint scanning machine. (*Id.*). At one point, Plaintiff fell to the ground.  Plaintiff claims that someone twisted his arm, and put their knee in his side, during this fracas.  (Doc. # 53-1 at p. 314).  When it became clear that Plaintiff refused to give his fingerprints, Defendants returned him to a one-man cell.  (*Id.* at p. 318).  Plaintiff claims that Defendant Abrams told him "that's how we do mother f'ers.  We are going to let you rest up and then we are going to 'F' you up again."  (Doc. # 53-1 at p. 305).

Later that day, jail personnel brought Plaintiff back to the "booking area" in an attempt to secure his fingerprints and identifying information.  (*Id.* at p. 80, pp. 318-19).  When Plaintiff

4

again refused to comply, Defendants again struggled with Plaintiff in an attempt to physically force him to place his fingers on the fingerprint scanner. (*Id.*). Plaintiff stated that one of the Defendant sheriffs hit him with a closed fist in his armpit. (*Id.* at pp. 335, 337). Further, he testified that one of the Defendants kicked him while he was on the ground, while others twisted his arms, attempted to pry open his hands (which were balled into fists), and struck him in the side with a knee. (*Id.* at pp. 334-337). He also alleges that Defendant Anderson tased him while he was on the ground. (*Id.* at pp. 317, 337). It was this tasing, he contends, that eventually caused him to comply, and submit to having his fingerprints and mugshot taken. (*Id.* at pp. 337-38). In total, this second scuffle lasted for approximately two and a half minutes, before Plaintiff relented, and allowed Defendants to take his fingerprints and picture. (Doc. # 58, Security Camera Video, Video # 3 at 14:00).

It is unclear whether Plaintiff alleges that a third incident of physical force occurred at the jail. At one point in his deposition, he alleges that "they did something" to him behind a wall, and outside of the view of the security cameras, before taking him to the booking area for the first time. (*Id.* at p. 309). However, he stated that the person who transported him from the pink room to the booking area, and presumably was involved in this possible third incident, was named "Stevens," and is not one of the named Defendants in this action. (*Id.*). When describing this incident, Plaintiff stated it was "real quick. I know I just received punches, one guy grabbed me by my face. I forgot his name." (*Id.* at p. 312). However, elsewhere in the same deposition, Plaintiff stated that Defendants used physical force "[o]nly to get [his] fingerprints." (*Id.* at. p. 328).

### III.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v.*

*Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.     Analysis

In his Amended Complaint, Plaintiff has asserted eleven claims for relief against Defendants. (*See* Doc. # 13). After granting in part and denying in part Defendants' Motions to

Dismiss, the following counts remain against Defendant Officers: Count One: state law false arrest and false imprisonment claims; and Counts One and Two: Fourth Amendment false arrest and false imprisonment claims. The following counts remain against Defendant Sheriffs: Counts One and Two: Fourth Amendment excessive force claims; and Count Six: state law assault and battery claims.

### A. Plaintiff's Individual Capacity Claims Against Defendant Officers

As mentioned above, the court previously granted Defendants' Motion to Dismiss with respect to certain of Plaintiff's claims implicating federal, individual capacity claims against Defendant Officers. In their Motion for Summary Judgment, Defendant Officers have asserted qualified immunity as a defense to Plaintiff's remaining Fourth Amendment false arrest and false imprisonment claims. (*See* Doc. # 52 at p. 9).

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless her actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Investments, Inc. v. County of Escambia, Fla*., 132 F.3d 1359, 1366 (11th Cir. 1998). The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *Lassiter v. Ala. A&M Univ., Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).

"We generally accord . . . official conduct a presumption of legitimacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991).

The court determines whether a defendant is entitled to qualified immunity by engaging in a three-step analysis. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136-37 (11th Cir. 2007). The initial burden is on the official claiming qualified immunity to establish that he was acting within his discretionary authority. *Id.* Once that initial showing is made, the burden shifts to the plaintiff to show that the "defendant's conduct violated a statutory or constitutional right." *Id.* at 1136-37 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Finally, "the plaintiff must show that the violation was 'clearly established.'" *Id.* at 1137; *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003) ("When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state." (citing *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1032-33 n.10 (11th Cir. 2001) (en banc))). If Defendant Officers can establish that they are entitled to qualified immunity, then Plaintiff's remaining federal, individual capacity claims will be dismissed. *See Randall*, 610 F.3d at 714.

### (1)    Discretionary Function Analysis

"A government official proves that he acted within the purview of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992) (internal citations and quotation marks omitted). In determining whether this test is met, the court does not analyze whether the official actually acted lawfully. *See id.* Rather, the issue is whether "the act

complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of [the governmental officer's] discretionary duties." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998); *see also Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1998) ("It is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority.").

Having considered the summary judgment record and Rule 56 evidence, the court concludes that Defendant Officers were acting within the purview of their discretionary duties at the time of Plaintiff's arrest. The video Plaintiff attached to his Amended Complaint, in addition to Plaintiff's own deposition testimony and the affidavits of Defendant Officers, clearly establish that the Defendant Officers' arrest of Plaintiff was undertaken pursuant to their official duties stemming from the execution of the Tammie Smith Bey arrest warrant. Defendant Officers were dispatched to the corner of Martin Luther King Jr. Boulevard and 17th Street to arrest Tammie Smith Bey on an outstanding warrant. (Doc. # 52 at p. 19). Plaintiff testified that Defendant Officers pulled up to the house in a Northport police car, and were clearly wearing police uniforms. (Doc. # 53-1 at pp. 142-144). Plaintiff further stated that when Defendant Officers arrived at the front door of his house, they identified themselves as Northport police officers, and stated that they had a warrant for Tammie Bey Smith. (*Id.* at pp. 151-152). When Plaintiff refused to allow Defendant Officers into the house to arrest Tammie Bey Smith, they then arrested Plaintiff for his alleged interference. (*Id.* at p. 195). Executing an arrest warrant (in the manner indicated by the Rule 56 evidence) cannot plausibly be argued to be unrelated to, or beyond the outer perimeter of, an officer's discretionary duties.

Here, the court concludes that Defendant Officers were, without question, acting within the scope of their discretionary authority. Therefore, the burden shifts to Plaintiff to show that

the officers' conduct violated a clearly established statutory or constitutional right. *See Skop*, 485 F.3d at 1136-37.

### (2) Plaintiff's Fourth Amendment Claims

#### a. Plaintiff's False Arrest Claims

The Fourth Amendment, which applies to the States through the Fourteenth Amendment, guarantees the right against unreasonable searches and seizures. U.S. Const. amend. IV; *see Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). Whether a warrantless arrest of a person, which is a seizure, is reasonable depends on a finding of probable cause. *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). That is, an arrest without a warrant and lacking probable cause violates the Constitution and can underpin a section 1983 claim. But the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010); *Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009).

Even without probable cause, an arresting officer may still be shielded from individual liability pursuant to the doctrine of qualified immunity if his "actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Case*, 555 F.3d at 1327 (emphasis added) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In wrongful arrest cases, the Eleventh Circuit has defined the "clearly-established" prong as calling for an "arguable probable cause" inquiry. *Case*, 555 F.3d at 1327 ("Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed.") (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the

Defendants could have believed that probable cause existed to arrest." *Lee*, 284 F.3d at 1195 (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001)).

Thus, the qualified immunity inquiry in the context of an arrest focuses on whether or not the officer reasonably, although perhaps mistakenly, believed that probable cause existed. *Id.* The facts of the case and the elements of the crime dictate whether there was probable cause, or arguable probable cause. *Skop*, 485 F.3d at 1137-38; *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004) ("Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime.").

Because the police had no warrant for *Plaintiff's* arrest, Defendant Officers must show that Plaintiff's arrest, at least, was based on arguable probable cause. Here, Plaintiff was purportedly arrested because he acted in a manner which interfered with law enforcement's attempts to arrest Tammie Smith Bey. Under Alabama law, "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person." Ala. Code § 13A-10-41(a) (emphasis added).

Generally, under the Fourth Amendment, police with a valid arrest warrant for a suspect are permitted to enter the suspect's home to arrest her absent a search warrant, so long as the police have a reasonable belief that she will be there. *Payton v. New York*, 445 U.S. 573, 603 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."); *see also Steagald v. United States*, 451 U.S. 204, 214-15, n.7 (1981) ("Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when

it is necessary to arrest him in his home."). However, "[i]f the person is in a third party's home, absent consent to enter, a search warrant for the residence must be obtained in addition to the arrest warrant." *Steagald*, 451 U.S. at 211-22.

Here, the court undertakes a two part analysis. Because Plaintiff was arrested for resisting Tammie Smith Bey's arrest, the first inquiry is whether Defendant Officers were properly executing the warrant for Tammie Smith Bey when Plaintiff resisted. If so, the second question becomes whether Defendant Officers had arguable probable cause to arrest Plaintiff for his actions. Based on the Rule 56 evidence before the court, it appears clear that 1702 Martin Luther King Jr. Boulevard was Plaintiff's home, for purposes of a Fourth Amendment analysis.[4] However, that fact alone is not fatal to Defendants' Motion for Summary Judgment. Indeed, in applying *Payton*, this Circuit has held that:

> [I]n order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant *a reasonable belief that the location to be searched is the suspect's dwelling*, and that the suspect is within the residence at the time of entry.

*United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995) (emphasis added). In performing this analysis, "courts must be sensitive to common sense factors." *Id.* Accordingly, Defendant Officers may still be entitled to summary judgment if they have established that there is no genuine dispute of material fact that their belief that (1) 1702 Martin Luther King Jr. Boulevard was Tammie Smith Bey's house, and (2) Tammie Smith Bey was within the house at the time of entry was reasonable. The court undertakes these inquiries in reverse order.

---

[4] While the record evidence is unclear regarding who actually claims ownership of 1702 Martin Luther King Jr. Boulevard, viewing the evidence in a light most favorable to Plaintiff (as the court must for summary judgment purposes), there is evidence which suggests that Plaintiff was temporarily staying in 1702 Martin Luther King Jr. Boulevard by permission of a friend at the time of his arrest. (Doc. # 52 at p. 61).

First, there is no question that Defendants Westbrook and Parker observed Tammie Smith Bey retreat into 1702 Martin Luther King Jr. upon their arrival. (Doc # 52 at pp. 20, 29). Further, once Plaintiff opened the door, Defendant Parker could see Tammie Smith Bey inside the home, and Defendant Westbrook could hear her inside the home. (*Id.*). Plaintiff points to no evidence that contradicts Defendants' affidavits, and has made no argument alleging that Defendants' belief that Tammie Smith Bey was within his house was unreasonable. (*See* Doc. # 54). Accordingly, the crucial issue for purposes of the *Payton* analysis is whether Defendant Officers reasonably believed that 1702 Martin Luther King Jr. Boulevard was Tammie Smith Bey's dwelling.

Defendant Officers have presented significant evidence on this issue. Defendant Parker stated, by way of affidavit, that he had observed Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard approximately five or six times before March 8, 2014. (Doc. # 52 at 28). He had also spoken to Tammie Smith Bey in the front yard of 1702 Martin Luther King Jr. Boulevard when he was called to the house for an issue with the water meter. (*Id.*). Defendant Westbrook stated, by way of affidavit, that he had seen Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard approximately six times before March 8, 2014. (*Id.* at 19). Approximately two months prior to March 8, 2014, Defendant Westbrook responded to a car accident at the corner of Martin Luther King Jr. Boulevard and 17th Street, and took a witness statement from Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard. Neither of the houses located at 1702 and 1706 Martin Luther King Jr. Boulevard is marked with a street number. (*Id.* at 24, 26).

Accordingly, Defendant Officers have pointed to substantial Rule 56 evidence that could have lead them to reasonably conclude that 1702 Marin Luther King Boulevard -- and not 1706

Martin Luther King Boulevard -- was Tammie Smith Bey's dwelling. Both of the Defendant Officers who initially arrested Plaintiff had seen Tammie Smith Bey on the porch of 1702 Martin Luther King Jr. Boulevard on multiple occasions. Further, each Defendant had specifically interacted with Tammie Smith Bey on the premises of the 1702 Martin Luther King Jr. Boulevard house. By contrast, neither Defendant had ever seen Tammie Smith Bey on the premises of 1706 Martin Luther King Jr. Boulevard. Moreover, at no time prior to, or during, the arrests did Plaintiff or Tammie Smith Bey tell Defendants that 1702 Martin Luther King Jr. Boulevard was not Tammie Smith Bey's house. (Doc. # 13, Exhibit B, Video of Arrest; Doc. # 52 at pp. 21, 30).

For his part, Plaintiff has not presented any evidence to contradict Defendant Officers' testimony. While he submitted an affidavit and brief in response to Defendant Officers' Motion for Summary Judgment, his affidavit does not reflect that he has any personal knowledge of facts that dispute Defendant Officers' Rule 56 evidence. Instead, he merely questions the credibility of Defendant Officers' affidavits, and argues that the testimony therein "seems [quite] absurd." (Doc. # 57 at p. 4). Based on the facts and circumstances within the knowledge of Defendant Officers, there is no genuine dispute of material fact that Defendant Officers reasonably believed that 1702 Martin Luther King Jr. Boulevard was Tammie Smith Bey's house.

Of course, the analysis does not end there. The fact that Defendant Officers' attempted search and entry of Plaintiff's home for Tammie Smith Bey was permissible under *Payton* does not foreclose Plaintiff's Fourth Amendment claim in its entirety. The question still remains whether Defendant Officers had arguable probable cause to arrest Plaintiff. So long as "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff," that is enough.

*Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). "Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime and the operative fact pattern." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007). Under Alabama law, "a person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself *or of another person*." Ala. Code §13A-10-041(a) (emphasis added). Accordingly, if Defendant Officers had arguable probable cause to believe that Plaintiff was intentionally preventing them from lawfully arresting Tammie Smith Bey, then they are entitled to qualified immunity.

The crucial issue here is whether the Defendant Officers' attempt to arrest Tammie Smith Bey was lawful. While it is a crime to resist a lawful arrest, Alabama law gives a citizen the right to use force to resist an unlawful arrest. *See Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1325 (11th Cir. 2014) (quoting Commentary to Ala. Code §13A-10-41). Moreover, a person "in lawful possession or control of premises ... may use physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of a criminal trespass by the other person in or upon such premises." *Id.* (citing Ala Code § 13A-3-25(a)). Thus, if Defendant Officers' attempt to arrest Tammie Smith Bey was unlawful, Plaintiff contends he would have been well within his rights to tell Defendant Officers that they could not arrest her, and such conduct would not provide arguable probable cause for Plaintiff's arrest for resisting arrest. However, as addressed above, the Rule 56 evidence demonstrates that there is no genuine dispute that, under *Payton* and *Magluta*, Defendant Officers were permitted to arrest Tammie Smith Bey – even in Plaintiff's house and under these circumstances. Thus, because

16

Defendant Officers' attempt to arrest Tammie Smith Bey was lawful, Plaintiff's conduct, if it constituted "intentional prevention," could constitute resisting arrest.

And, indeed, under Alabama law an offender may use words alone, and need not use physical force, in order to resist arrest. *See Sims v. State*, 733 So. 2d 926, 930 (Ala. Crim. App. 1998) (stating that the defendant's "lying to police could constitute resisting arrest because he initially prevented the police from discovering his identity and thus prevented his arrest"). Here, Plaintiff attempted to prevent Defendant Officers from arresting Tammie Smith Bey by telling them that they did not have the authority to do so, and by attempting to close the front door on Defendant Parker as he was trying to arrest Tammie Smith Bey. (Doc. # 52 at p. 20). Without question, his actions constitute "intentional prevention." Accordingly, there is no genuine dispute of material fact that Defendant Officers had arguable probable cause to arrest Plaintiff for resisting arrest. As such, they are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims.

This is especially true with respect to Defendant Conger. While Defendants Parker and Westbrook were the initial arresting officers, Defendant Conger did not arrive at the house until Defendants Parker and Westbrook were already struggling with Plaintiff on the front porch. (Doc. # 52 at p. 36). As addressed above, Defendants Parker and Westbrook are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff based on the facts available to them. Defendant Conger witnessed only a struggle between Plaintiff and Defendants Parker and Westbrook. This certainly provided Defendant Conger arguable probable cause to join his fellow officers and assist in arresting Plaintiff. *See Morris*, 748 F.3d at 1325.

### b.      Plaintiff's False Imprisonment Claims

A section 1983 false imprisonment claim arises where the common law elements of false imprisonment are accompanied by a Fourteenth Amendment due process violation. *See Cannon v. Macon County*, 1 F.3d 1558, 1562-63 (11th Cir. 1993). "A detention on the basis of a false arrest presents a viable [section] 1983 action." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (citing *Reeves v. City of Jackson*, 608 F.2d 644 (5th Cir. 1979)). "Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* at 1526 (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995)). However, as with false arrest, arguable probable cause serves equally as a bar to Plaintiff's § 1983 claims for false imprisonment. *See German v. Sosa*, 399 F. App'x 554, 55 6 (11th Cir. 2010) (finding that arguable probable cause entitled the defendants to qualified immunity for the same reason for both false arrest and false imprisonment claims). As addressed above, Defendant Officers had arguable cause to arrest Plaintiff. As such, they are entitled to qualified immunity as to Plaintiff's False Imprisonment claims.

## B.      Plaintiff's State Claims Against Defendant Officers

Count One of Plaintiff's Amended Complaint assert state law claims against Defendant Officers for false arrest and false imprisonment. (Doc. # 13 at ¶¶ 27-29). Defendant Officers argue that state law immunity protects them from all of Plaintiff's state law claims. (Doc. # 52 at p. 15).

### (1)      State-Agent Immunity Analysis

Defendant Officers claim that, under Alabama law, they are entitled to state-agent immunity as to all of Plaintiff's state law claims. For many of the same reasons that the court

grants Defendant Officers qualified immunity, the court also finds it appropriate to grant Defendant Officers state law immunity.

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Brown*, 608 F.3d at 740-41 (quoting *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002)). In *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which bars suit against law enforcement officers effecting arrests, except to the extent the officer acted willfully, maliciously, fraudulently, in bad faith, beyond his legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise. *Id.* at 405. Additionally, Alabama law provides for discretionary-function immunity, which immunizes law enforcement officers from certain tort liability. Ala. Code § 6-5-338(a) (1994) ("Every peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."). The *Cranman* test for state-agent immunity governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6-5-338(a). *Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005) ("The restatement of State-agent immunity as set out in *Cranman*, now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a)." (internal citations omitted)).

The Supreme Court of Alabama has established a two-part burden shifting framework for applying *Cranman*'s state-agent immunity test. *Brown*, 608 F.3d at 740-41 (quoting *Ex Parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)). First, a defendant bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the state agent to

immunity. *Reynolds*, 946 So. 2d at 452. If the defendant makes that showing, the burden then shifts to the plaintiff to show that the state agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. *Id.*

Notwithstanding this framework, the Alabama Supreme Court has provided a shortcut for claims of false arrest. In these cases, the absence of "arguable probable cause" defeats an officer's claim to state-agent immunity. *Borders v. City of Huntsville*, 875 So. 2d 1168, 1179-82 (Ala. 2003) (reversing summary judgment for officer on the basis of § 6-5-338 immunity on plaintiff's excessive force, false arrest, false imprisonment and assault and battery claims where there was evidence that could support a finding that the officer lacked arguable probable cause); *see also Mann v. Darden*, 630 F. Supp. 2d 1305, 1315 (M.D. Ala. 2009) (applying Alabama law and denying an arresting officer's claim of immunity on state law battery claim after observing that the "Alabama Supreme Court has held that, while arrests and attempted arrests are generally discretionary functions, officers will not be given discretionary-function immunity when they act without arguable probable cause" (citing *Borders*, 875 So. 2d 1168)).

Plaintiff alleges counts for false imprisonment and false arrest against Defendant Officers. (Doc. # 13 at ¶ 28). Under Alabama law, the torts of "false arrest" and "false imprisonment" have different elements. *Griffin v. Beasley*, 2012 WL 2339779, at *5 (M.D. Ala. June 19, 2012) (citing *Higgins v. Wal-Mart Stores, Inc.*, 512 So. 2d 766 (Ala. 1987) ("in a cause of action for false arrest, a plaintiff must prove that the defendant caused him to be arrested without probable cause"), *overruled on other grounds Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280 (Ala. 1993); *Walker v. City of Huntsville*, 62 So. 3d 474, 492 (Ala. 2010) (explaining that Alabama Code § 6-5-170 "defines false imprisonment as 'the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty'")).

False imprisonment "includes directly restraining a person as well as threatening force to keep him in place or make him go where he does not wish to go." *Yabba v. Ala. Christian Acad.*, 823 F. Supp. 2d 1247, 1251 (M.D. Ala. 2011) (citing *Crown Central Petrol. Corp. v. Williams*, 679 So. 2d 651, 653 (Ala. 1996)). Therefore, "a false or unlawful arrest -- that is, an arrest without probable cause -- will support a false imprisonment claim." *Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1229 (M.D. Ala. 2012) (citing *Upshaw v. McArdle*, 650 So. 2d 875 (Ala. 1994)).

Of course, even though a state law claim for false arrest and one for false imprisonment may be distinct causes of action,[5] whether Plaintiff's claims are due to be dismissed in this context turns on whether Defendant Officers had probable cause to arrest Plaintiff at his home for resisting the arrest of Tammie Smith Bey. Under Alabama law, "[a]n officer may make a warrantless arrest if a misdemeanor occurs in his presence." *Hawkins v. State*, 585 So. 2d 154 (Ala. 1991); *see also* Ala. Code § 15-10-3(a)(1) (allowing for a warrantless arrest "[i]f a public offense has been committed . . . in the presence of the officer"). Again, as addressed above, the Rule 56 evidence demonstrates that there is no genuine dispute of material fact that Defendant Officers acted with arguable probable cause. For this reason, Defendant Officers' Motion for Summary Judgment (Doc. # 52) as to Plaintiff's Count One for false arrest and false imprisonment is due to be granted.

## C. Plaintiff's State Claims Against Defendant Sheriffs

Plaintiff has alleged state law claims for assault and battery against Defendant Sheriffs. (*See* Doc. # 13 at ¶¶ 48-51). In their motion for summary judgment, Defendant Sheriffs allege

---

[5] The federal courts have not been consistent in their treatment of these actions. *See Griffin*, 2012 WL 2339779, at *5 (claiming distinct actions exist); *Exford*, 887 F. Supp. 2d at 1231 ("[U]nder Alabama law, an unlawful arrest amounts to a type of false imprisonment, not a standalone tort.").

that they are entitled to immunity pursuant to the Alabama Constitution of 1901 and Alabama state law. (Doc. # 53 at ¶¶ 12-16).

**(1) State Immunity Analysis**

There is no Rule 56 evidence which explicitly purports to establish the specific jobs each of the Defendant Sheriffs perform.[6] However, Plaintiff refers to Defendants Abrams, Anderson, and Collard as "sheriffs" at various times in his deposition. (*See* Doc. # 53-1 at p. 360 ("I would like them to pay for – from the police and the sheriffs collectively, I would like them to pay for the damages.")). Moreover, Plaintiff, in his Amended Complaint, identifies Defendants Abrams, Collard, and Anderson as deputy sheriffs. (Doc. # 13 at ¶¶ 7-9). Accordingly, the evidence before the court, interpreted in light of Plaintiff's Amended Complaint, indicates that Defendants Abrams, Collard, and Anderson are deputy sheriffs for purposes of state agent immunity analysis at this summary judgment stage.

The law is well-established that in Alabama, pursuant to Article I, Section 14 of the Alabama Constitution, sheriffs and deputy sheriffs are absolutely immune from suits for damages when "acting within the line and scope of their employment." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1431 (11th Cir. 1998); *Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996). In other words, sheriffs and deputy sheriffs, in their official and individual capacities, are absolutely immune from suit when the action is, in effect, one against the state. *Phillips v. Thomas*, 555 So.2d 81, 83 (Ala. 1989). Therefore, as long as "a sheriff or deputy acts within the scope of his or her employment, immunity exists with respect to state-law claims, even for

---

[6] While Defendants *argue* that (1) sheriffs and deputies are entitled to immunity under Alabama law, and (2) that Defendant Collard is a detention officer, they cite to no record evidence to support their argument. (Doc. # 53 at p. 12). And indeed, after a thorough examination of the record, the court notes that there is no record evidence establishing the specific nature, scope, or title of the jobs held by Defendants Abrams, Anderson, and Collard.

willful or malicious actions." *Harrington v. City of Phenix City*, 2012 WL 204168, at *7 (M.D. Ala. Jan. 24, 2012).

> A sheriff or deputy is entitled to this immunity in all instances except for actions brought:
>
> (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute.

*Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987). Plaintiff's Amended Complaint seeks neither injunctive relief nor declaratory judgment. Rather, after listing his claims, including his claim for assault and battery against Defendant Sheriffs, Plaintiff's lone prayer for relief is "the full and just amount of five million dollars (5,000,000.00) plus punitive damages to the extent allowed by law plus interest and cost[s]." (Doc. # 13 at p. 13). Accordingly, none of the possible exceptions to the deputies' immunity are met here. Instead, Plaintiff's assault and battery claims may only proceed if there is a genuine issue of material fact which respect to whether Defendant Sheriffs were acting in the "line and scope of their employment." *Lancaster*, 116 F.3d at 1431.

But there is no such genuine dispute here. The undisputed evidence shows that Defendant Sheriffs were acting within the line of their employment when the alleged assault occurred. The video of the alleged incidents shows Defendant Sheriffs, dressed in uniform, at the Tuscaloosa County jail. (Doc. # 58, Security Camera Video). Moreover, Plaintiff testified in his deposition that Defendant Sheriffs used force against him when they were trying to take his fingerprints as he was being processed into jail. (Doc. # 53-1 at p. 320 ("Only reason why they did use force, because I wouldn't give my fingerprints."); at p. 328-29 ("They used physical force against me to get my fingerprints… only to get my fingerprints.")). There are no facts on

the record to suggest that Defendant Sheriffs were involved in a "personal errand" or some other departure from their line of employment at the time of the alleged assault and battery. *See Ex parte Haralson*, 853 So.2d 928, 933 (Ala. 2003). Instead, the Rule 56 evidence indicates only that they were at their place of employment, trying to perform a function of their employment (*i.e.*, booking an inmate into custody) at the time of the alleged assault. As such, Defendant Sheriffs are entitled to state agent immunity, and Defendants' Motion for Summary Judgment is due to be granted as to Plaintiff's state law claims for assault and battery.

**D.      Plaintiff's Federal Claims Against Defendant Sheriffs**

The court has read Plaintiff's Amended Complaint to allege Defendant Sheriffs violated Plaintiff's Fourth, Fifth, Seventh, Eighth, and Fourteenth Amendment rights. In its prior Memorandum Opinion, this court dismissed each of Plaintiff's claims except for his Fourth Amendment excessive force claim against the Defendant Sheriffs in their individual capacities.[7] In their motion for summary judgment, Defendant Sheriffs raise the defense of qualified immunity with respect to Plaintiff's remaining Fourth Amendment claim.

In the discussion below, the court applies the three-step qualified immunity analysis, *see Skop*, 485 F.3d at 1136-37, and for the following reasons, concludes that Defendant Sheriffs' Motion for Summary Judgment is due to be granted as to Plaintiff's Fourth Amendment excessive force claim.

**(1)      Discretionary Function Analysis**

As a threshold matter, the court concludes that the facts, as presented on the Rule 56 record, show plainly that Defendant Sheriffs were, at all relevant times, on duty during Plaintiff's confinement. Indeed, Plaintiff admits that it is "undisputed that the Defendants were in fact

---

[7] The court determined in its prior Memorandum Opinion, and reiterates now, that Plaintiff cannot be construed as having sued Defendant Sheriffs in their official capacity.

performing their discretionary function and within the scope of their duty" when they struggled to take his fingerprints and tased him while he was handcuffed. (Doc. # 58 at p. 7). And this is consistent with the undisputed evidence before the court. As mentioned above, Plaintiff testified in his deposition that Defendant Sheriffs used force against him when they were trying to take his fingerprints as he was being processed into jail. (Doc. # 53-1 at p. 320 ("Only reason why they did use force, because I wouldn't give my fingerprints."); at p. 328-29 ("They used physical force against me to get my fingerprints… only to get my fingerprints.")).

Consistent with the court's application of the discretionary function analysis applied to the Defendant Officers, the court does not look at whether the official actually acted lawfully. *See Sims*, 972 F.2d at 1236. Instead, the only issue here is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of [the governmental officer's] discretionary duties." *Harbert Int'l, Inc.*, 157 F.3d at 1282. Thus, for the purposes of the discretionary function analysis, Plaintiff's allegations of excessive force are irrelevant. Taking custody of an arrestee and requiring him to provide identifying information, if done for a proper purpose, is clearly within a sheriff's discretionary duty under Alabama law. In Alabama, the sheriff "has the legal custody and charge of the jail in his or her county and all prisoners committed thereto." Ala. Code § 14-6-1. Furthermore, the sheriff is required to obtain the name, address, and identifying information of all prisoners of the jail. *Id.* at § 36-22-8; *see also id.* at § 15-5-30 (person must identify himself when questioned by a deputy).

Looking objectively at the circumstances as presented by the Rule 56 evidence, it is readily apparent that Defendant Sheriffs were exercising their discretionary function in maintaining custody of Plaintiff as a prisoner in the Tuscaloosa County Jail and attempting to obtain his identifying information. Having concluded that Defendant Sheriffs were acting within

the scope of their discretionary functions, the burden shifts to Plaintiff to show that Defendant Sheriffs' conduct violated a clearly established statutory or constitutional right. *See Skop*, 485 F.3d at 1136-37.

### (2) Plaintiff's Fourth Amendment Claim

Initially, Plaintiff presented a number of Fourth Amendment claims in his pleadings; however, only his excessive force claims remain. Plaintiff's excessive force claims against Defendant Sheriffs center predominately on allegations of physical abuse that Plaintiff suffered while in custody at the Tuscaloosa County Jail. After thorough examination of the Rule 56 record, the court concludes that Defendant Sheriffs are entitled to qualified immunity as to Plaintiff's Fourth Amendment excessive force claims, and those claims are due to be dismissed against Defendant Sheriffs. Specifically, Defendant Sheriffs were acting within the scope of their discretionary functions, and Plaintiff has failed to present Rule 56 evidence that Defendant Sheriffs (1) violated a clearly established constitutional right, or, at a minimum, (2) that any right which Defendant Sheriffs purportedly violated was clearly established at the time of his injury.

### (a) Defendant Sheriffs Did Not Violate Plaintiff's Fourth Amendment Rights

The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Accordingly, not all force used during the course of an arrest amounts to a violation of the arrestee's Fourth Amendment rights. Instead, the test in this Circuit is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Sample v. City of Atlanta*, 916 F.2d 1548, 1550 (11th Cir. 1990) (quotation marks omitted) (citing *Graham*, 490 U.S. at 397). Indeed, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Graham*, 490 U.S. at

396. Instead, we must "slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

This Circuit has noted other secondary factors to consider in assessing whether force is reasonable: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted."[8] *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004).

> We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense.

*Buckley v. Haddock*, 292 F. App'x 791, 794 (11th Cir. 2008).

Viewed in a light most favorable to Plaintiff, the Rule 56 evidence indicates that Defendant Sheriffs used force against Plaintiff on two separate occasions.[9] Neither application of force was unreasonable in the constitutional sense. While the reasonableness determination is inherently fact-specific, the court has looked to guidance from this Circuit's decisions in similar cases. In this Circuit, it is clear that the use of force such as a taser against an individual who is submitting to arrest, and is in no way resisting the incidents of arrest, is unreasonable. *Claridy v.*

---

[8] Our Circuit has cautioned against the use of subjective factors when assessing whether the use of force is reasonable. *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1354 (11th Cir. 2015) ("The test is not a subjective one… . We do not consider whether an officer acted in good faith or sadistically and maliciously."). Accordingly, the above factors are helpful to the extent that they may be used to assess the objective reasonableness of an officer's actions. The court does not employ these factors as a means to assess Defendant Sheriffs' subjective intent or "whether the force was applied in good faith or maliciously and sadistically." *Id.* at 1353-54.

[9] As addressed above, in his deposition Plaintiff seems to suggest that other individuals "did something" to him behind a wall and outside of the view of the security cameras. (Doc. # 52-1 at p. 309). However, Plaintiff did not state that any of the Defendant Sheriffs were involved in this additional altercation in his deposition, and there is no other record evidence that suggests that Defendant Sheriffs used force on Plaintiff a third time.

*Golub*, 632 F. App'x 565, 569 (11th Cir. 2015) ("Assuming, as the district court did, that Plaintiff was lying face-down on the sidewalk, with his hands behind his back and submitting to arrest… Defendant's second use of the taser against him was unreasonable.").  Moreover, the use of force (again, such as a taser, which Plaintiff claims was used against him), even if initially reasonable, may become unreasonable if a defendant continues to use force after it is no longer necessary. *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009) (use of force was excessive where initial use of taser was reasonable, but the defendant then continued to repeatedly tase the plaintiff while the plaintiff lay immobilized on burning hot pavement); *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016) (use of taser five times was unreasonable where evidence established that the plaintiff stopped resisting arrest after the first two tasings).

By contrast, the use of force against an individual who is resisting arrest may be reasonable, even if the state actor strikes, kicks, or uses a taser on that individual. *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1355 (11th Cir. 2015) (use of force, including striking, kicking, and tasing, was reasonable where the plaintiff "refus[ed] to surrender his hands to be cuffed despite the application of escalating force and repeated use of a taser").  Indeed, force such as "using an uncomfortable hold" and "use of a taser gun" may be reasonable even where a plaintiff's resistance is not physical, and instead involves only belligerence and refusal to comply with police instructions.  *Zivojinovich v. Barner,* 525 F.3d 1059, 1072 (11th Cir. 2008) (defendant's use of "an uncomfortable hold" was not unreasonable where the plaintiff had disobeyed her order to remain seated, and defendant's use of taser gun was not unreasonable where the plaintiff intentionally sprayed blood on defendant while he spoke).

While the reasonableness analysis is inherently fact-specific, the court has analyzed two cases from this Circuit.  Each case had similar facts and each involved an application of force

which was found to be reasonable. In *Burkett*, Plaintiff's 18 year-old son ("Burkett") became agitated when police officers (at his parents' behest) attempted to take him for a psychiatric evaluation. *Burkett v. Alachua Cty.*, 250 F. App'x 950, 951 (11th Cir. 2007). As Burkett's father helped the defendant officers place Burkett in their police car, Burkett "head-butted" his father, struggled with the officers, and bit the hand of one of the officers. *Id.* Burkett was ultimately taken to the county jail, where he was placed in a holding cell from 4 a.m. until around 8 a.m. *Id.* At that time, officers entered Burkett's cell and ordered him to lie down on the floor so that officers could handcuff him; but Burkett was unresponsive to this command, and an officer shot him with a taser gun and handcuffed him. *Id.* At his first appearance before a judge, the judge ordered that a blood sample be taken from Burkett. *Id.* Accordingly, officers and a nurse entered Burkett's cell while he was handcuffed and shackled at his legs. *Id.* Burkett did not respond to an officer's order to lie down, so the officer grabbed Burkett by the arm. *Id.* at 951-52. When Burkett became agitated, several officers wrestled him to the floor, held him face down, and held a blanket over his head. *Id.* at 952. During this struggle, one officer used a stun gun against Burkett, and another officer administered "knee strikes" to Burkett's outer thigh. *Id.* The blanket was removed from Burkett's head after he was placed in a three-point restraint; however, at that point Burkett had stopped breathing, and later was pronounced dead. *Id.*

In spite of these facts, the court found that the defendant officers did not apply excessive force in violation of the Fourth Amendment.

> Here, considering Burkett's agitation when officers entered his cell to draw blood along with his demonstration of an altered mental state and earlier aggression that included biting an officer, an officer could have believed that the force used was reasonably necessary. When officers were in Burkett's cell for the blood test, Burkett became aggressive; and several officers were needed to restrain him. The Correctional Officers were required to make an instant decision about how to keep Burkett under control and how to secure a blood sample from him. We do

not believe that the Correctional Officers applied excessive force in violation of
the Fourth Amendment.

*Id.*

In *Buckley*, a deputy sheriff stopped the plaintiff for speeding. *Buckley v. Haddock*, 292
F. App'x 791, 792 (11th Cir. 2008). During the traffic stop, the plaintiff became agitated about
getting the ticket and refused to the sign the traffic citation, even though signing is required by
law. *Id.* After twice warning the plaintiff that he would be arrested if he did sign the citation,
the deputy sheriff handcuffed the plaintiff and walked the plaintiff out of his car. *Id.* While
walking from his car to the patrol car, the plaintiff sat on the ground, crossed his legs, and
refused to stand up. *Id.* The deputy attempted to lift the plaintiff to his feet, but the plaintiff
remained limp and did not stand. *Id.* After repeatedly warning the plaintiff that a taser device
would be used, and after giving the plaintiff time to comply, the deputy used a taser against the
plaintiff. *Id.* at 792-93. The deputy sheriff repeated this pattern twice more, and both times the
plaintiff refused to stand up even after the deputy tased him. *Id.* at 793. Finally, another police
officer arrived, and at that point the plaintiff gave up his resistance and complied with the
officers' orders. *Id.*

In finding that the deputy's use of force was within the range of reasonable conduct under
the Fourth Amendment, the court noted (among other factors) that "the deputy could not
complete the arrest -- that is, truly control Plaintiff -- because Plaintiff was resisting." *Id.* at 794.
The court reasoned that:

> The government has an interest in arrests being completed efficiently and without
> waste of limited resources: police time and energy that may be needed elsewhere
> at any moment. Even though Plaintiff was handcuffed, he still refused repeatedly
> to comply with the most minimal of police instructions – that is, to stand up and
> to walk to the patrol car. That Plaintiff was resisting arrest weighs in the deputy's
> favor.

*Id.*

Here, Plaintiff admits that he repeatedly refused to comply with Defendant Sheriffs' orders. When asked his name, Plaintiff responded that he was "here unlawfully, and at this time I can't give you my name." (Doc. # 53-1 at p. 304). When asked again, Plaintiff continued to refuse to provide Defendant Sheriffs with his name, or allow Defendant Sheriffs to take his fingerprints or his "mugshot." (*Id.* at pp. 313-316). When the evidence is viewed in a light most favorable to Plaintiff, Plaintiff did not resist Defendant Sheriffs' efforts to force his hand onto the fingerprint reader by punching, kicking, or otherwise lashing out at Defendant Sheriffs on either of the two occasions. (*See id.* at pp. 319-20). However, Plaintiff balled his hands up and sank to the ground while Defendant Sheriffs tried to obtain his fingerprints. (*Id.*).

Again, while a state actor's use of force may be unreasonable when used against a person who is no longer resisting arrest, the facts in this case clearly demonstrate that Plaintiff continued to resist throughout the incidents made the basis of this action. And, viewed in a light most favorable to Plaintiff, the record does not suggest that Plaintiff resisted Defendant Sheriffs by "kicking and screaming," but it does demonstrate that he repeatedly resisted Defendant Sheriffs' efforts to obtain his identifying information. Plaintiff repeatedly and insistently refused to comply with Defendant Sheriffs' orders. And when Defendant Sheriffs grabbed Plaintiff's hands to force his fingers onto the fingerprint reader, Plaintiff balled up his hands and dropped to the floor to prevent Defendant Sheriffs from taking his fingerprints. In this Circuit, it is clear that an officer may reasonably use force to overcome an arrestee's resistance, even where that resistance involves the arrestee's refusal to obey the officer's orders (as opposed to resistance by physical force). *Burkett*, 250 F. App'x at 952; *Buckley*, 292 F. App'x at 794. Here, Plaintiff was delivered to Tuscaloosa County Jail and the care of Defendant Sheriffs on charges of resisting arrest. In

addition to this prior aggression, Plaintiff consistently refused Defendant Sheriffs' orders, and refused to answer important identifying questions which Defendant Sheriffs asked him. At the moment Plaintiff balled up his fists and sank to the ground, Defendant Sheriffs had to make an instant decision. Because Plaintiff had repeatedly refused to identify himself, Defendant Sheriffs had no way of knowing who he was, or the possible threat he may have posed to them or others in Tuscaloosa County Jail. After repeated attempts to secure Plaintiffs' identifying information without physical force, Defendant Sheriffs ultimately chose to use force to obtain Plaintiffs' fingerprints. Given the government's interest "in arrests being completed efficiently and without waste of limited resources," under the circumstances, Defendant Sheriffs' decision to use force was not unreasonable nor was the amount of force used. *Buckley*, 292 F. App'x at 794.

This conclusion is supported by Plaintiffs' own deposition testimony. Plaintiff testified that Defendant Sheriffs specifically used force against him in an effort to obtain his fingerprints. (Doc. # 53-1 at p. 320 ("Only reason why they did use force, because I wouldn't give my fingerprints."); at p. 328-29 ("They used physical force against me to get my fingerprints… only to get my fingerprints.")). He further stated that he did not allow Defendant Sheriffs to take his fingerprints even after they first used force against him. (Doc. # 53-1 at p. 335 ("[Defendant Collard] used closed hands and hit me in the armpit to get the fingerprint, but it had no effect.")). Moreover, as soon as Plaintiff allowed Defendant Sheriffs to take his fingerprints, they no longer used force against him, and "it all stopped." (*Id.* at p. 337). Accordingly, the court finds that Defendant Sheriffs are entitled to summary judgment as to Plaintiff's Fourth Amendment claim, as their conduct "falls within the outside borders of what is reasonable in the constitutional sense." *Buckley*, 292 F. App'x. at 794.

**(b)  Defendant Sheriffs Did Not Violate a Clearly Established Federal Right**

Even if Defendant Sheriffs' conduct violated Plaintiff's constitutional rights (and to be sure, it did not), they would nonetheless be entitled to qualified immunity because any purported right which they would have violated was not clearly established at the time of the incident. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "[W]here the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law." *Thomas v. Roberts*, 323 F.3d 950, 954 (11th Cir. 2003). Moreover, when that preexisting case law is fairly distinguishable from the circumstances facing the government official, the case cannot "clearly establish the law for the circumstances facing that government official." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002).

Plaintiff has not cited any case law establishing that Defendant Sheriffs' use of force was clearly unlawful. And the court's own review of relevant case law confirms that there was no existing case law at the time of Defendant Sheriffs' actions which gave fair and clear notice that their conduct violated federal law. *Thomas*, 323 F.3d 950, 954. As detailed above, the courts in perhaps the two most factually similar cases from this Circuit both held that the defendants' conduct did not violate the plaintiff's constitutional rights. *Buckley*, 292 F. App'x. at 796; *Burkett*, 250 F. App'x at 954.

Moreover, cases such as *Lee* and *Oliver*, which condemn the use of force on an individual who does not resist arrest, do not clearly establish a constitutional right in this case. *Lee v.*

*Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009). Here, the Rule 56 evidence, even when viewed in a light most favorable to Plaintiff, plainly demonstrates that he was resisting Defendant Sheriffs' efforts to take his fingerprints, and refused to comply with Defendant Sheriffs' orders, at the time they used force against him. In distinguishing *Lee*, the *Buckley* court noted that "[t]he use of force in *Lee* was wholly uncalled for; *Lee* decides nothing about the gamut of options for force usage in the circumstances of arrestee intransigence." *Buckley*, 292 F. App'x at 798. In light of the factual particularities of this case, Plaintiff has not demonstrated that Defendant Sheriffs had fair and clear notice that their conduct would violate federal law. And because the force used here was not so unwarranted and excessive as to violate the Fourth Amendment on its face, the court concludes that Defendant Sheriffs' are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims. *Cf. Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) (denying qualified immunity, even in the absence of controlling judicial precedent, where defendant officers ordered dog to attack a non-resisting arrestee).

## V.     Defendant Sheriffs' Motion to Strike

Defendant Sheriffs styled a portion of their reply brief as a motion to strike (Doc. # 60 at ¶¶ 6-8). In his response brief, Plaintiff attached copies of his medical records. (Doc. # 58 at pp. 12-42). Defendant Sheriffs argue that the records attached to Plaintiff's filings have not been properly authenticated. (Doc. # 60 at ¶ 7). Having found that Defendant Sheriffs' Motion for Summary Judgment is due to be granted, Defendant Sheriffs' motion to strike is due to be administratively terminated as moot.

## VI.    Conclusion

For the reasons explained above, and after careful review, the court concludes Defendant Officers' motion for summary judgment is due to be granted.  Defendant Sheriffs' motion for summary judgment is due to be granted.  A separate order will be entered.

**DONE** and **ORDERED** this April 20, 2017.

_____
R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE